# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**KYLE LEE GREGORY,**

          Plaintiff,

   v.

**COMMISSIONER OF SOCIAL SECURITY,**

          Defendant.

Case No. 2:16-CV-334
JUDGE JAMES L. GRAHAM
Magistrate Judge Jolson

## REPORT AND RECOMMENDATION

Plaintiff, Kyle Gregory, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. For the reasons that follow, it is **RECOMMENDED** that the Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

### I.    BACKGROUND

Plaintiff protectively applied for benefits on January 3, 2013, alleging disability since September 28, 2012, due to a history of brain surgeries, depression, silent seizures, problems with short term memory, shaking of hands, an inability to lift, unstable walking/balance, soreness/swelling in and around the neck, Methicillin-resistant Staphylococcus aureus ("MRSA")/meningitis infection, and fatigue. (Doc. 12, Tr. 375-81, 404). Plaintiff was last insured on September 30, 2016. (*Id.*, Tr. 234).

After initial administrative denials of Plaintiff's claims, an administrative law judge ("the ALJ") heard his case on October 24, 2014. (*Id.*, Tr. 249-79). On December 24, 2014, the ALJ

issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.*, Tr. 232-43). On March 21, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (*Id.*, Tr. 1-7).

Plaintiff filed this case on April 15, 2016, and the Commissioner filed the administrative record on July 19, 2016. (Doc. 12). Plaintiff filed a Statement of Specific Errors on September 2, 2016 (Doc. 13), and the Commissioner responded on October 17, 2016. (Doc. 14).

### A. Personal Background

Plaintiff was born in March 1967 (Doc. 12, Tr. 400), and he was 50-years-old on the alleged onset date of disability. (*Id.*, Tr. 241). He has a high school education, with attendance in special education (*Id.*, Tr. 405), and work experience as a surgical technician, cleaner, and material handler. (*Id.*, Tr. 406).

### B. Testimony at the Administrative Hearing

Plaintiff testified at the administrative hearing that his disability began following his surgery to remove a cyst in September 2012. (*Id.*, Tr. 253). He testified that following the surgery, he acquired the MRSA virus, his shunt failed, his catheter failed, and he had to "have everything removed." (*Id.*, Tr. 253-54). He spent two to three months in the hospital, but has been cleared since that time. (*Id.*, Tr. 254). He had follow-up surgery in August 2014 to place a shunt and catheter "back in." (*Id.*, Tr. 255).

He testified that he has short term memory loss and has trouble remembering to do things without written reminders. (*Id.*, Tr. 255). He experienced balance issues following his November 2012 surgery. (*Id.*, Tr. 258). Plaintiff's other problems include being able to lift only small things such as a gallon of milk or some clothes in a basket. (*Id.*). If too much laundry is in

the basket, the weight of the laundry strains the back of his head where the shunt was placed. (*Id.*). He testified that he is unable to stand or sit for a long period of time unless his head is supported. He also testified that he can sit in a regular chair for only 20 minutes before he must lay down or find something that will support his head. He further testified that he could stand for roughly 20 minutes. (*Id.*, Tr. 259).

On a typical day, Plaintiff folds laundry and starts dinner. (*Id.*, Tr. 262). On a given day, he also may take a short walk. (*Id.*). He testified that he is active in his church, which he attends on Sunday mornings and Wednesday evenings. (*Id.*). He is a member of the Shrine Club but has not gone to meetings lately. He testified that he could take care of his personal hygiene. (*Id.*, Tr. 263). He can drive around town. (*Id.*). He needs reminders to go to the doctor's office, but remembers on his own to attend church. (*Id.*). He also goes to the store for small items but needs a list of things to buy. (*Id.*, Tr. 264).

He further testified that even with his last shunt placement, he got headaches for which he takes Ibuprofen. (*Id.*, Tr. 265). He also reported difficulty grasping and holding things. (*Id.*, Tr. 266). He testified that his speech is affected from his surgery and he must speak slowly and deliberately, noting he gets his "tongue tied up." (*Id.*). He reported that he used a cane for four months after the surgery but no longer needs it. (*Id.*, Tr. 266-67). He reported that he does not have much energy since the surgery and that he sits or lies down after performing simple tasks. (*Id.*, Tr. 267). He also claimed to take a 2-hour nap each day. (*Id.*).

Plaintiff believed that he could not maintain a regular work schedule because he would miss a lot of work due to headaches. (*Id.*, Tr. 267-28). He reported that he was taken off Norco so that he would not get addicted. (*Id.*, Tr. 268). He also reported shaking in the hands, which

3

happens daily for 2 or 3 hours. (*Id.*, Tr. 269).

The vocational expert testified that a hypothetical person of similar age and education as Plaintiff with a limitation of sedentary exertional work could not perform Plaintiff's past jobs, but could perform other jobs available in the national economy such as a document preparer, address clerk, and telephone quotation clerk. (*Id.*, Tr. 275-76). Additionally, the vocational expert testified that Plaintiff would be precluded from work if he was off task more than 15% of the workday or absent more than one day per month. (*Id.*, Tr. 277).

### C. Relevant Medical Evidence

#### 1. Physical Impairments

##### a. Surgical History

Plaintiff began complaining of headaches and blurred vision in October 2010. (*Id.*, Tr. 776). His family physician, Dr. Michael K. Brockett, referred him to the Pars Neurology clinic. (*Id.*, Tr. 690, 692-95). Due to an abnormal CT showing "what appears to be congenital variation of the posterior fossa versus arachnoid cyst," (*Id.*, Tr. 691), an MRI of Plaintiff's brain was taken which showed several large arachnoid cysts. (*Id.*, Tr. 688).

In March 2011, Plaintiff underwent surgery to have a shunt placed into the cyst to drain. (*Id.*, Tr. 511). In September 2011, he had a surgery to reposition this shunt (*Id.*, Tr. 510); with a second revision in May 2012. (*Id.*, Tr. 510, 1344). In September 2012, Plaintiff underwent an arachnoid cyst resection to remove the cyst. Plaintiff was then diagnosed with shunt malfunction and underwent shunt revision and evacuation of pseudomeningocele in November 2012. (*Id.*, Tr. 504, 517-18). Following that revision, cultures grew MRSA and the procedure was complicated with aseptic meningitis. (*Id.*, Tr. 504, 899).

4

When seen for follow-up in January 2013, Plaintiff's home health nurse reported that he experienced mild seizure activity. (*Id.*, Tr. 1410-11). On May 8, 2013, one of Plaintiff's treating neurologists, M.B. Louden, M.D., noted that Plaintiff had no seizures while taking Lamictal, and that Plaintiff felt good with an unchanged examination. Dr. Louden instructed Plaintiff to continue taking Lamictal to have annual follow-up appointments. (*Id.*, Tr. 1401).

Plaintiff underwent shunt placement surgery again in August 2014. (*Id.*, Tr. 1747-60).

### b. Primary Care Physician Michael K. Brockett, M.D.

The record shows that Plaintiff treated with his primary care physician, Dr. Brockett, as early as December 2007. (*Id.*, Tr. 1239).

Following Plaintiff's surgeries as noted above, in October 2012, Plaintiff exhibited significant serous otitis on the right with significant thrush in the back of his mouth. He was prescribed antibiotics. (*Id.*, Tr. 1236).

When examined in February 2013, Plaintiff was AAOx3 (Alert, Awake, & Oriented to Time, Place, and Person). Plaintiff reported that he was feeling better but had some dizziness and headache. His posterior cervical area and occipital area exhibited soft swelling from his previous surgery. Dr. Brockett found no redness or pain with palpation. His incisions were well healed. Plaintiff's musculoskeletal and neurologic examinations were normal. Plaintiff was prescribed Lexapro (for depression) and Zocor (for hyper lipidemia). (*Id.*, Tr. 1232-35).

Dr. Brockett ordered a head CT in September 2013, which was stable with "prominent extra-axial fluid attenuation posterior fossa fluid collection identified which causes mass effect upon the cerebellum." (*Id.*, Tr. 1681). In August 2013, Plaintiff denied joint pain, muscle aches, headache, and seizures, and he appeared comfortable (*Id.*, Tr. 1713-1716). In September

5

2013, while CT scans showed a slightly enlarging cyst in his head, he reported "no headaches associated with this." (*Id.*, Tr. 1694).

In March 2014, it was noted that Plaintiff was still "doing well" after his last cranial surgery in 2012. (*Id.*, Tr. 1703). At that appointment, he also denied back pain, joint stiffness, and muscle aches. (*Id.*). He denied having an abnormal gait, headache, localized weakness, paresthesias, or seizures. (*Id.*, Tr. 1704). Plaintiff appeared comfortable, his head and neck were normal upon exam, and he was counseled to exercise. (*Id.*, Tr. 1704-06).

Dr. Brockett completed two identical opinions on behalf of Plaintiff's disability insurance carrier, on March 25, 2014, and again on October 3, 2014. In both reports, Dr. Brockett opined that Plaintiff is restricted to no lifting/carrying, climbing, bending, kneeling, handling, operating foot controls, or reaching above his shoulders. According to Dr. Brockett's assessment, Plaintiff can only occasionally (up to 1/3 of the day) sit, stand, walk, and drive, and that he could never climb, bend, kneel, handle, operate foot controls, or reach above the shoulder. (*Id.*, Tr. 1676, 1939).

In May 2014, Plaintiff complained to Dr. Brockett of increasing headaches. He noted the severity and frequency were similar to the headaches with increasing size of his cerebral cyst. (*Id.*, Tr. 1757-59). Dr. Brockett noted that Plaintiff's "overall exercise tolerance" was sedentary. (*Id.*, Tr. 1762).

### 2. Mental Impairments

#### a. Neuropsychological Evaluation

Plaintiff underwent a neuropsychological evaluation over a three-day period in July 2011 with Paul Dunn, Ph.D. (*Id.*, Tr. 766-79). Plaintiff reported to Dr. Dunn that he was experiencing

6

short-term memory difficulties. It was following the initial symptoms of headaches and blurred vision that his cognitive problems began to affect his daily functioning. (*Id.*, Tr. 766). Testing revealed that Plaintiff had average perceptual reasoning skills, but marginal verbal comprehension skills, low-average working memory skills and marginal processing speed skills. Results from the Wechsler Memory Scale-IV showed Plaintiff's scores ranging from 3rd percentile to 50th percentile, with three of the five indices being in the borderline range. (*Id.*, Tr. 776).

### b. Jinhui Wang, Ph.D.

Dr. Wang evaluated Plaintiff for disability purposes on May 28, 2013. (*Id.*, Tr. 1584-88). Plaintiff reported that he was disabled due to his brain surgeries and short-term memory loss. He noted "I cannot say depression interfere[d] with work because I haven't been back to work." (*Id.*, Tr. 1585). Plaintiff also reported that at past jobs, he got along well with co-workers, and coped with pressure just by talking about it. He reported that physical conditions interfered with his work since his brain surgeries. In addition, he reported suffering from depression due to his physical impairments. When discussing his daily activities, Plaintiff reported being able to make meals, drive, shop, make change with money, and that he had many friends and watched sports. (*Id.*, Tr. 1586).

On mental status examination, Dr. Wang found Plaintiff was well groomed, friendly, and cooperative. His speech was clear and logical, he described his mood as up and down, and there were no noted signs of anxiety. He did, however, appear sad. Plaintiff was fully oriented, with no indications of obsessions, compulsions, hallucinations, or delusions. Plaintiff was able to track the conversation, correctly recall four digits forward and two backward, and had normal

7

insight and judgment.  (*Id.*, Tr. 1586-87).  Dr. Wang ultimately diagnosed adjustment disorder with depressed mood and assessed a Global Assessment of Functioning (GAF) score of 61.  (*Id.*, Tr. 1587).

Dr. Wang opined that Plaintiff was able to understand, remember, and carry out instructions and that Plaintiff had no limitation in maintaining concentration, persistence, or pace.  In addition, he had no impairments in social functioning, and he was "expected to respond appropriately to work pressures in a work setting."  (*Id.*, Tr. 1588).

### c. State Agency Assessment

Two state agency reviewers also commented on Plaintiff's mental impairments.  Janet Souder, Psy.D. reviewed the record on June 3, 2013, and opined that Plaintiff had mild restrictions in his activities of daily living, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration.  (*Id.*, Tr. 315).  She opined that Plaintiff had the ability to understand and remember "simple and most moderately complex tasks" "without requirements for extended, close focus or strictly enforced pace/productivity standards."  (*Id.*, Tr. 318-19).  Dr. Souder noted that Plaintiff's "depressive symptoms are improved and stable with medication." (*Id.*, Tr. 319).  Dr. Souder found Plaintiff was only partially credible, noting even though Plaintiff reported that he has trouble standing and walking, his physical examinations shows that he consistency has a normal gait and strength.  (*Id.*, Tr. 316).  Vicki Warren, Ph.D. made essentially the same findings upon reconsideration of the record, concluding that Plaintiff "retains the ability to attend to tasks without requirements for extended, close focus or strictly enforced pace/productivity standards."  (*Id.*, Tr. 329-34).

### D. The Administrative Decision

On December 24, 2014, the ALJ issued an unfavorable decision. (*Id.*, Tr. 232-43). The ALJ determined that Plaintiff had the following severe impairments: arachnoid cyst, history of seizures, affective disorder, and cognitive impairment. (*Id.*, Tr. 234). The ALJ found that he did not, however, meet the requirements of an impairment listed in 20 CFR Subpart P, Appendix 1. (*Id.*).

The ALJ ultimately concluded that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work. Specifically, Plaintiff can never climb ladders, ropes, or scaffolds, occasionally balance and stoop, and frequently crawl. He should avoid all use of hazardous machinery and exposure to unprotected heights. Any work must additionally be limited to routine tasks with relaxed or flexible production rate requirements in the shift. (*Id.*, Tr. 236). Based on the testimony of the vocational expert, the ALJ determined that because Plaintiff is limited to sedentary work, he is unable to perform his past relevant work as a surgical technician, cleaner, material handler, or assembler. (*Id.*, Tr. 241). The ALJ next found that there are jobs that Plaintiff can perform such as a document preparer, address clerk, or telephone quotation clerk. (*Id.*, Tr. 242). He therefore concluded that Plaintiff was not disabled under the Social Security Act from September 28, 2012, through the date of his decision. (*Id.*).

### II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

### III. DISCUSSION

On appeal, Plaintiff alleges two errors: (1) the ALJ failed to accord adequate weight to the opinion of treating primary care physician, Dr. Brockett; and (2) the RFC determination is not supported by substantial evidence because of Plaintiff's mental limitations. (*See generally* Doc. 13).

#### A. Dr. Brockett's Treating Physician Opinion

In his first assignment of error, Plaintiff argues the ALJ erred in according only "little weight" to the opinion of Dr. Brockett, one of Plaintiff's treating physicians. (Doc. 13 at 3). Specifically, Plaintiff claims the ALJ erred in not giving more weight to the functional capacity reports completed by Dr. Brockett. As an initial matter, the Court notes that the social security regulations expressly provide that in cases decided through an administrative hearing, the responsibility for deciding a claimant's RFC rests with the ALJ. *See Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (citations omitted); *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ thus was not required to accept Dr. Brockett's conclusions as to that ultimate issue.

In addition, two related rules govern how an ALJ is required to analyze a treating

physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

During the Administrative Hearing, the ALJ asked Plaintiff about his surgeon, Dr. Ghodsi, and then inquired about other physicians, including Dr. Brockett:

> Q. Are you under anybody else's routine care?
> A. Just my primary—
> Q. Regular care. I'm sorry. Regular care, sir.
> A. My primary doctor, Dr. Brockett.
> Q. And what is Dr. Brockett doing?
> A. Keeps—if I have any issues that Dr. Ghodsi doesn't do, then I go to Dr. Brocket.
> Q. And what has Brockett been doing that Ghodsi has not?
> A. Basically about the same. Not a whole—
> Q. What do you mean?
> A. He doesn't—there's not a whole lot neither one of them can really do.

(Doc. 12-2, Tr. 260-61).

In his opinion, the ALJ assigned "little weight" to Dr. Brockett's opinions as stated in the functional capacity reports for three primary reasons. (*Id.*, Tr. 240). First, the ALJ determined that "these opinions do not cite any evidence in support of these disabling limitations." (*Id.*). In other words, the one-page checkbox form provides scant information. Here is the March 2014 form:

[Abilities Form for patient Kyle Gregory, #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, DOB 03/04/1967, Date of Last Office Visit 3/12/14, Claim Number 113-003855, completed by Michael K. Brockett, MD, Family Practice, Phone 740-374-4273, dated 3/25/14, Address: 400 Matthews St, Marietta, OH 45750. Form indicates patient has functional limitations/restrictions with various checkbox entries for Lift/Carry, Sit/Stand/Walk/Climb/Bend/Kneel/Drive/Finger/Handle/Operate Foot Controls/Reach above the shoulder.]

(Doc. 12-9, Tr. 1676). The October 2014 form is the same, with a different date. (*See id.*, Tr.

12

1939). Thus, the ALJ correctly noted that Dr. Brockett did not explain his disability conclusions in any meaningful detail. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) ("Conclusory statements from physicians are properly discounted by ALJs.").

Second, the ALJ found that Dr. Brockett's own clinical findings do not support the forms he completed. In particular, when seen in May 2014, Dr. Brockett opined that Plaintiff has an overall exercise tolerance of sedentary exertion, which is consistent with the ALJ's conclusions. (*Id.*, Tr., 241 (citing to *id.*, Tr. 1762)). Further, throughout his opinion, the ALJ relied on Plaintiff's medical records, including Dr. Brockett's treatment notes:

> At medication check in [February] 2013, the claimant reported that he was feeling better but had some dizziness and headache (Exhibit 9F/2-5). Examination revealed some soft swelling from previous surgery around the cervical and posterior occipital area, but there was no redness or pain with palpation (Exhibit 9F/4). Musculoskeletal findings were normal and cranial nerves were intact (Exhibit 9F/4). The claimant was prescribed Lexapro and Zocor (Exhibit 9F/4).

(*Id.*, Tr. 240). The ALJ thus appropriately considered the consistency of Dr. Brockett's opinions with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(4).

Third, the ALJ observed that Dr. Brockett's opinion "appear to be a sympathetic opinion to support the claimant's long-term disability insurance claims, but they are excessive in light of the objective findings." (*Id.*, Tr. 240-41). An ALJ may consider a physician's motivations when assessing an opinion. *See Langenbahm v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 121071 *, 2013 WL 4517794 (S.D. Ohio Aug. 26, 2013) ("In other words, the ALJ thought it was possible that Dr. Laureno-Alvarez and Mr. Bishop's opinions may have been influenced by a desire to help Plaintiff obtain disability benefits."). Thus, this additional reason supports the ALJ's conclusion.

Plaintiff counters that the ALJ's analysis was incomplete because he failed to consider expressly the substantial length of the doctor's treating relationship, the frequency of examination, the nature and extent of the treating relationship, and the extent to which Dr. Brockett was familiar with other information in the case record. (Doc. 13 at 4). However, where a physician's opinion is not accompanied by the kinds of findings of clinical and diagnostic evidence required to support a doctor's opinion that a claimant has disabling limitations, the ALJ is not required to accept it. *See* 20 C.F.R. § 404.1527(c)(3) ("Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Thus, the Court finds that the ALJ's reasons were enough to discount Dr. Brockett's conclusory opinions. *See* 20 C.F.R. § 404.1512(a); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). Further, the Court concludes that the ALJ provided Plaintiff "good reasons" for assigning little weight to Dr. Brockett's disability opinions and consequently rejects Plaintiff's first assignment of error.

**B. The ALJ's MRFC Determination**

Plaintiff also contends that the ALJ erred when fashioning his MFRC. "MRFC" is a residual functional capacity which limits its consideration to mental capabilities. Plaintiff claims the ALJ got it wrong because he failed to evaluate the state agency reviewing consultants' opinions properly. (Doc. 13 at 5). Under SSR 96-6p, an ALJ is required to consider such opinions:

> Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative

law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

SSR 96-6p, 1996 WL 374180, *2 (Jul. 2, 1996). Here, the ALJ considered the state agency reviewers' opinions, but Plaintiff insists that the consideration was flawed because it did not take into account Plaintiff's need to take "breaks" during the workday. (Doc. 13 at 5). Although not entirely clear because Plaintiff identifies no state agency reviewer by name, Plaintiff seems to rely on Dr. Warren's opinion for his argument. (*See* Doc. 13 at 5 (citing one page of Dr. Warren's opinion)). The Court notes that the opinions of Dr. Souder and Dr. Warren are basically the same. *See supra* at 8. So even if Plaintiff is relying on Dr. Souder's opinion as well, the Court would come to the same conclusion.

On August 8, 2013, state agency reviewing psychologist Dr. Warren completed an electronic form analogous to a Mental Residual Functional Capacity Assessment ("MRFCA") form. (*Id.*, Tr. 332-334). In this form, Dr. Warren was asked to "[r]ate the individual's sustained concentration and persistence limitations" in eight different categories including the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.*, Tr. 334). Dr. Warren noted that Plaintiff had moderate limitations in this area and one other, five areas were rated as "not significantly limited," and one area, "the ability to carry out very short and simple instructions" was rated as "no evidence of limitation in this category." (*Id.*, Tr. 333-334). Dr. Warren was then required to take these eight ratings, and "[e]xplain in narrative form the sustained concentration and persistence limitations indicated above." (*Id.*, Tr.

15

333-334). When asked to synthesize her ratings in these eight areas pertaining to concentration and persistence, Dr. Warren wrote that Plaintiff "retains the ability to attend to tasks without requirements for extended, close focus or strictly enforced pace/productivity standards." (*Id.*, Tr. 334). This is the limitation that the ALJ relied upon when formulating Plaintiff's RFC to work "limited to routine tasks with relaxed or flexible production rate requirements in the shift." (*Id.*, Tr. 236).

Plaintiff argues that the ALJ "failed to explain his reasoning for not including an accommodation in his RFC for the State agency medical consultants' opinion that the plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Doc. 13 at 5). In other words, Plaintiff argues that the ALJ should have accounted for each piece of the state agency reviewer's opinion.

Other courts have considered and rejected this argument and have concluded that the first section of the MRFCA form is merely a worksheet for the evaluator and does not constitute the evaluator's residual functional capacity assessment. *See Velez v. Comm'r of Soc. Sec.*, 2010 WL 1487599, *6,(N.D. Ohio Mar. 26, 2010) ("In general, . . . the administrative law judge is not required to include the findings in Section I in formulating residual functional capacity."); *Kachik v. Astrue*, 2010 WL 3852367, *6 (W.D. Pa. Sept. 27, 2010) (citing *Liggett v. Astrue*, 2009 WL 189934,*8 (E.D. Pa. 2009)); *Berry v. Astrue*, 2009 WL 50072, *15 (W.D. Va. Jan. 7, 2009); *Norris v. Astrue*, 2008 WL 4911794, *16 (E.D. N.C. Nov. 14, 2008); *Malueg v. Astrue*, 2007 WL 5480523, **6-7 (W.D. Wis. May 30, 2007). Indeed, the form itself makes clear that it is the narrative portion that embodies the actual assessment.

This Court agrees. The ALJ was not required to include expressly the "moderate" notations in formulating Plaintiff's MRFC from the first section of the worksheet. Further, in determining Plaintiff's MRFC, the ALJ also considered all relevant evidence of record and reasonably determined that Plaintiff was limited to routine tasks with relaxed or flexible production rate requirements in the shift. (Doc. 12, Tr. 236). Consequently, the Court rejects Plaintiff's second assignment of error.

## IV. RECOMMENDED DISPOSITION

For the reasons stated, it is **RECOMMENDED** that the Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision

of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: July 7, 2017

/s/Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE